[Crim. No. 6665. Third Dist. Jan. 31, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
JEROME HOWARD WATERS, Defendant and Appellant.

## COUNSEL

John P. Mancuso, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Edward W. Bergtholdt and Garrick W. Chock, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

JANES, J.—After denial of his motion to suppress (Pen. Code, § 1538.5),[1] defendant pled guilty to charges of assault with a deadly weapon (§ 245, subd. (a)) and possession of restricted dangerous drugs (Health & Saf. Code, § 11910). Pursuant to a plea bargain, charges of attempted murder (§§ 187, 663) and assault with intent to kill (§ 217) were dismissed. Defendant appeals from the judgment, contending only that his motion to suppress should have been granted. (§ 1538.5, subd. (m).)

The motion was submitted to the superior court on the transcript of the preliminary examination; no additional evidence was offered at the 1538.5 hearing.

### FACTS

At about 10 a.m. on November 4, 1971, Richard Turner was shot by a man with a handgun at the El Tejon Motel in West Sacramento. Turner, an occupant of the motel, was unable to identify his assailant, who was black and was wearing a hat and a black leather coat. The man fired once, the bullet entering Turner's cheek and exiting at the back of his neck. The assailant then turned and ran toward the rear of the motel.

The victim ran to the motel office and "told them to call the ambulance and the police." The motel manager telephoned the Yolo County sheriff's department.

Yolo County Sheriff's Officers Smith and Germanhausen were in Germanhausen's car in West Sacramento near the Yolo County end of the Capitol Bridge, which leads to Sacramento. There was a "Yolo County" radio in the vehicle. According to Smith's testimony, a "[b]roadcast came over the radio stating that there was a shooting," a "possible 187." The broadcast also reported that "two black Negro male adults" were suspects and were in a "black new Cadillac leaving the scene of the crime." Although Smith fixed the date as November 4, his testimony did not specify the time when the broadcast was received, nor did he describe the broadcast as having originated at the sheriff's department or that it even reported where the shooting had occurred. However, another witness at the preliminary examination, Sheriff's Officer King, gave testimony indicating that the broadcast had been made at approximately 10:05 a.m. by the department's radio dispatcher, who had placed the shooting at the El Tejon Motel and had given the address.

---

[1] All section numbers cited herein are from the Penal Code, unless otherwise specified.

A few seconds after receiving the broadcast, Smith and Germanhausen saw "a fairly new shiny black Cadillac" going up the Capitol Bridge on-ramp on the Yolo County side, headed for Sacramento. They could see two persons in the Cadillac. The two officers, in their vehicle, followed the Cadillac across the bridge. Enroute, Smith was able for the first time to determine that both occupants of the Cadillac were Negro males. (Germanhausen did not testify.) The Cadillac proceeded at a normal speed, and its driver committed no traffic violations.

Having crossed the bridge and followed the Cadillac into the City of Sacramento, Smith and Germanhausen were joined by a third officer, Deputy Lineberger, who was in another vehicle. At 4th and "T" Streets, Lineberger motioned the Cadillac over to the curb and pulled in front of it, while Smith and Germanhausen drove up to its rear. The Cadillac stopped. Defendant was sitting up front on the passenger side. Smith approached him on foot with gun drawn and yelled, "Police officers. Put your hands up. You're under arrest." Lineberger went to the driver's side of the Cadillac with his weapon drawn and said words to the same effect.

Defendant raised his hands. Smith opened the passenger's door and helped defendant out. As he did so, Smith saw part of the handle of a gun protruding from a black leather jacket on the car floor between defendant's feet. Smith ordered defendant to put his hands on top of the Cadillac, and then he patted defendant down, finding nothing. At the officer's command, defendant kicked off his shoes so Smith could check them for concealed weapons. The officer saw what he thought was a wrapped razor blade inside defendant's sock by his right ankle. Smith handcuffed defendant, placed him in a squad car, and pulled off defendant's right sock, finding four packets of methamphetamines inside it.

Officer King, who arrived at the scene shortly after the arrest, removed the black leather jacket and gun from the Cadillac. Ballistic tests showed that the gun, a revolver, had fired a bullet found near where Turner was shot. Two of defendant's fingerprints were on the revolver. The driver of the Cadillac was a prosecution witness at the preliminary examination. The driver testified that he had let defendant off in a street behind the El Tejon Motel the morning of the shooting, and had picked him up again near there shortly before the arrest. The driver also stated that the jacket found in the car, and a hat discovered on the ground at the motel, were similar to items worn by defendant that day.

### DEFENDANT'S CONTENTION

█ "[A]lthough an officer may make an arrest based on information

received through 'official channels,' the prosecution is required to show that the officer who originally furnished the information had probable cause to believe that the suspect committed a felony." (*People* v. *Madden* (1970) 2 Cal.3d 1017, 1021 [88 Cal.Rptr. 171, 471 P.2d 971].) "In sum, when an officer furnishes to another officer information which leads to an arrest, the People must show the basis for the former officer's information." (*Remers* v. *Superior Court* (1970) 2 Cal.3d 659, 667 [87 Cal. Rptr. 202, 470 P.2d 11].)

■ Invoking the foregoing rule, defendant argues that "the prosecution has failed to show the source of the information which prompted the broadcast." He points out that "[t]here is no testimony by the person who reported to the police originally nor from the officer who made the broadcast about the source of his information." He asserts that, without such showing, his arrest cannot be validated on the basis of the observations of the arresting officers, who did not see the Cadillac operated in other than a lawful manner. Hence defendant contends that the arrest was unlawful, and that the revolver and methamphetamines "found during the search incident to that arrest" should have been suppressed on his motion.

We hold that, regardless of whether the arrest was valid, the motion was properly denied.

■ " 'In reviewing a determination of a trial court on a 1538.5 motion, the function of the reviewing court is to determine whether there was substantial evidence to support the trial court's findings . . . .' [Citations.]" (*People* v. *Medina* (1972) 26 Cal.App.3d 809, 815 [103 Cal.Rptr. 337].) ■ Although neither the motel manager nor the sheriff's radio dispatcher was a witness at the preliminary examination, Officer King testified that "the manager of the El Tejon" had phoned the sheriff's department and had given the information (thereafter officially broadcast) concerning the shooting and the departure from the scene of two black males "in a shiny black Cadillac, late motel [*sic,* model]." Therefore, on the section 1538.5 motion, the trial court could reasonably infer that the broadcast heard by Smith and Germanhausen had been transmitted by the radio dispatcher and that the dispatcher, in turn, was acting upon information furnished by the motel manager.

This case is somewhat out of the ordinary in that the police informant (the motel manager) was not himself the victim of the crime; nor did the evidence indicate that the manager told the sheriff's department that he had witnessed the shooting, that he had personally seen Turner's gunshot wound (or had even been in the motel office when the victim ran there),

or that he had himself observed the departure of two black men in a Cadillac. And Turner, the victim, neither contacted the sheriff's office *prior to the broadcast*[2] nor purported to have seen two Negro males leaving in a car. Hence concepts relevant to determining probable cause *for arrest,* based on the reports of reliable citizen-informants, are not applicable here. (See generally, *People* v. *Hogan* (1969) 71 Cal.2d 888, 890-891 [80 Cal.Rptr. 28, 457 P.2d 868]; *People* v. *Abbott* (1970) 3 Cal.App.3d 966 [84 Cal.Rptr. 40].)

Without question, defendant was under arrest almost from the outset of the vehicle stop. The lawfulness of the seizure of the gun and drugs, however, is not dependent upon the validity of the arrest. The bedrock issue is whether, in making such seizure, the officers did so while exercising rights they would have had even if Smith and Lineberger had *not* said, "You're under arrest." It is clear that the officers had such rights, as incidents of their right to *temporarily detain* the occupants of the Cadillac for questioning. The fact that the officers announced an arrest in no way changes the fact that their conduct thereafter involved no more than a temporary detention would have allowed.

Having received the official broadcast, it was the right—indeed the duty—of Smith and Germanhausen, assisted by Lineberger, to stop and investigate the Cadillac which matched the description of the getaway car and which carried occupants of the same number, sex, and race as those suspected. (See, *People* v. *Anthony* (1970) 7 Cal.App.3d 751, 761 [86 Cal.Rptr. 767]; *People* v. *Ortega* (1969) 2 Cal.App.3d 884, 892 [83 Cal.Rptr. 260]; *People* v. *Turner* (1969) 2 Cal.App.3d 632, 635 [82 Cal.Rptr. 763]; *People* v. *Hupp* (1943) 61 Cal.App.2d 447, 450 [143 P.2d 84].) ■ "It is well established that circumstances short of probable cause to make an arrest may justify an officer's stopping motorists for questioning, and, if the circumstances warrant it, the officer may in self-protection request a suspect to alight from an automobile and to submit to a superficial search for concealed weapons." (*People* v. *Anthony, supra,* at p. 760; see also, *People* v. *Nickles* (1970) 9 Cal.App.3d 986, 991-992 [88 Cal.Rptr. 763]; *People* v. *Hunt* (1967) 250 Cal.App.2d 311, 313-314 [58 Cal.Rptr. 385].) ■ Therefore, given the report of the shooting, Officer Smith was well within his rights in having defendant put up his

---

[2] The Attorney General attempts to find support in the fact that, upon hearing the broadcast, Officer King went to the motel and interviewed the victim. That circumstance is irrelevant to the issue before us, since "a warrantless arrest or search cannot be justified by facts of which the [arresting or searching] officer [here Smith, Germanhausen, and Lineberger] was wholly unaware at the time. . . ." (*People* v. *Superior Court* (1972) 7 Cal.3d 186, 198 [101 Cal.Rptr. 837, 496 P.2d 1205].)

hands and in removing him from the Cadillac for a pat-down. (*People* v. *Nickles, supra,* at p. 992; *People* v. *Anthony, supra,* at p. 762; *People* v. *Turner, supra,* at pp. 635-636.)

Smith's observation of the protruding gun handle, while defendant was leaving the car, did not constitute a search; and the gun was lawfully seized thereafter. (See, *People* v. *Nickles, supra,* 9 Cal.App.3d at p. 992; *People* v. *Ortega, supra,* 2 Cal.App.3d at p. 892.) The removal of defendant's shoes and socks was a reasonable incident of the weapons pat-down. Consequently, the discovery of the contraband in the sock was valid. (Cf., *People* v. *Woods* (1970) 6 Cal.App.3d 832, 838 [86 Cal.Rptr. 264].)

■ "[I]f the detaining officer [here, Smith] himself does not have personal knowledge of facts justifying the detention, but acts solely on the basis of information or direction given him through police channels, the prosecution must establish in court, when challenged, evidence showing that the officer who originally furnished the information [here, the radio dispatcher] had probable cause to believe that the suspect had committed a felony, *or, at the very least, that such officer* [the dispatcher] *was in possession of facts amounting to circumstances short of probable cause, which would have justified him to personally make the detention."* (*Restani* v. *Superior Court* (1970) 13 Cal.App.3d 189, 196 [91 Cal.Rptr. 429].) (Italics added.)

The report which the motel manager telephoned in to the sheriff's department would have justified defendant's temporary detention by officers (including the dispatcher) to whom the report was circulated. (See, *Mann* v. *Superior Court* (1970) 3 Cal.3d 1, 6-7 [88 Cal.Rptr. 380, 472 P.2d 468]; *McClellan* v. *Superior Court* (1971) 18 Cal.App.3d 311, 314 [95 Cal.Rptr. 590].) ■ "[T]o justify temporary detention the information upon which the officer relied need not be of the quality required for probable cause to arrest; *it need not be established that the source was of proven reliability."* (*Lane* v. *Superior Court* (1969) 271 Cal.App.2d 821, 824 [76 Cal.Rptr. 895] (italics added); see, *People* v. *Stephenson* (1969) 268 Cal.App.2d 908, 911 [74 Cal.Rptr. 504].)

### MODIFICATION OF JUDGMENT

■ The abstract of judgment on the count for assault with a deadly weapon recites that "Defendant was charged and admitted being, or was found to have been armed with a deadly weapon to wit: a gun at the time of commission of the offense, or a concealed deadly weapon at the time of his arrest within the meaning of Penal Code Sections 969c and 3024."

As the Attorney General commendably points out, the recital concerning defendant's being armed must be stricken from the judgment. There was no charge, admission, or finding pertaining to a concealed weapon. Moreover, sections 969c and 3024 of the Penal Code (as well as § 12022) are inapplicable in those cases where the fact that a defendant was armed forms the basis for his conviction of the principal offense, e.g., assault with a deadly weapon. (*People* v. *Floyd* (1969) 71 Cal.2d 879, 882-883 [80 Cal.Rptr. 22, 457 P.2d 862], and cases cited; *People* v. *Cervantes* (1970) 13 Cal.App.3d 587, 595 [91 Cal.Rptr. 691]; see, *People* v. *Coleman* (1970) 8 Cal.App.3d 722, 734-735 [87 Cal.Rptr. 554]; *People* v. *Harrison* (1970) 5 Cal.App.3d 602, 608-609 [85 Cal.Rptr. 302].) The frequency with which records on appeal have come to us with abstracts of judgments which overlook this rule indicates that trial courts would be well advised to remind their personnel that printed abstract of judgment forms must be used with caution.

This case presents an aggravated example of such error, for the reporter's transcript clearly shows that *one of the terms of the plea bargain accepted by the trial court was that Penal Code "Section 12022.5 and 3024 will not be imposed."* (Italics added.) Although the plea bargain did not mention section 12022, the inapplicability of section 12022 to the instant case is compelled by the authorities cited above.

The Attorney General also suggests that this court should "modify the judgment or instruct the trial court on remand to . . . make a finding" that defendant was armed with a deadly weapon for purposes of Penal Code section 1203, pertaining to probation. Cases where such modification has been either made or directed by the appellate courts (including a specification of the nature of the weapon) appear to be cases where the fact that the defendant was armed with a deadly weapon of a specified type was charged in the accusatory pleading and found by the trier of fact, although the charge did not state that application of section 1203 would be sought. Some uncertainty remains as to whether the trial court in a jury case has the power to make a more particularized finding concerning the nature of the weapon than that made by the trier of fact. (See, e.g., *People* v. *Najera* (1972) 8 Cal.3d 504, 506, 517 [105 Cal.Rptr. 345, 503 P.2d 1353]; *People* v. *Williams* (1970) 2 Cal.3d 894, 910-911 [88 Cal.Rptr. 208, 471 P.2d 1008]; *People* v. *Floyd, supra,* 71 Cal.2d at pp. 880, 883-884; Pen. Code, § 969c.) Decisions of this court have indicated that, even in a jury case, it is the trial court's function to determine the facts relative to the applicability of section 1203. (*People* v. *Harrison, supra,* 5 Cal.App.3d at pp. 608-609; *People* v. *Savala* (1969) 2 Cal.

App.3d 415, 421-422 [82 Cal.Rptr. 647], disapproved on other grounds in *People* v. *Beagle* (1972) 6 Cal.3d 441, 452 [99 Cal.Rptr. 313, 492 P.2d 1]; *People* v. *Brewster* (1969) 276 Cal.App.2d 750, 754 [81 Cal.Rptr. 237].)

In the case at bench, the information charged that the assault had been made "with a deadly weapon, to wit: a gun." Defendant's plea of guilty to that count constituted an admission of all facts alleged in it. (*Arenstein* v. *California State Bd. of Pharmacy* (1968) 265 Cal.App.2d 179, 190 [71 Cal.Rptr. 357].) Thus no question concerning the respective functions of judge and jury is presented here with regard to section 1203. Since it is supported by the record of his plea, the judgment may be modified to provide that defendant was armed within the meaning of that section. (See, *People* v. *Harrison, supra,* 5 Cal.App.3d at p. 609.)

The judgment is modified by striking therefrom the recital that "Defendant was charged and admitted being, or was found to have been armed with a deadly weapon to wit: a gun at the time of commission of the offense, or a concealed deadly weapon at the time of his arrest within the meaning of Penal Code Sections 969c and 3024." The judgment is further modified by adding to the judgment a provision that "At the time of commission of the assault defendant was armed within the meaning of Penal Code section 1203, and the weapon was a gun, but at the time of commission of that offense sections 3024, 12022, and 12022.5 of the Penal Code were inapplicable." In all other respects the judgment as modified is affirmed.

Richardson, P. J., and Friedman, J., concurred.